UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

MELISSA REN'E KENNEDY,               )
                                     )
                Plaintiff,           )
                                     )          No. 2:12-cv-226
v.                                   )
                                     )          *Collier / Lee*
COMMISSIONER OF SOCIAL SECURITY,     )
                                     )
                Defendant.           )

## REPORT AND RECOMMENDATION

Plaintiff Melissa Ren'e Kennedy brought this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying her supplemental security income ("SSI"). Plaintiff has moved for judgment

on the pleadings and Defendant has moved for summary judgment [Docs. 9, 11]. Plaintiff alleges

the Administrative Law Judge ("ALJ") improperly assigned less weight to the opinion of her treating

physician and the opinion of a state agency physician, and further erred in assessing her subjective

complaints. For the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for judgment

on the pleadings [Doc. 9] be **GRANTED IN PART** to the extent it seeks remand to the

Commissioner and **DENIED IN PART** to the extent it seeks an award of benefits; (2) the

Commissioner's motion for summary judgment [Doc. 11] be **DENIED**; and (3) the Commissioner's

decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42

U.S.C. § 405(g).

# I.  ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed her application for SSI on June 5, 2009, alleging an onset date of November 29, 2007 (Transcript ("Tr.") 101-04).  Plaintiff's claim was denied initially and upon reconsideration and she requested a hearing before the ALJ (Tr. 54-65).  The ALJ held a hearing on September 10, 2010, during which Plaintiff was represented by an attorney (Tr. 25-44).  The ALJ issued his decision on November 8, 2010 and determined Plaintiff was not disabled because there were jobs that existed in significant numbers in the economy that she could perform (Tr. 6-19).  The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-3).  Plaintiff filed the instant action on June 1, 2012 [Doc. 1].

# II.  FACTUAL BACKGROUND

## A.  Education and Background

Plaintiff was 37 years old at the time of the hearing before the ALJ, had left school in the tenth grade, and received a GED diploma when she was 20 (Tr. 30, 126).  Plaintiff had learned masonry and stone work from her father, for whom she would work off and on whenever she did not have a job, and she had also previously worked as a waitress, pizza deliverer, cashier, and doughnut packager (Tr. 30-31).  Plaintiff testified she last worked in late 2007 (Tr. 31).  Plaintiff testified she was physically unable to work because of pain in her back, neck and hips; she stated she was on Oxycodone, Soma and Valium for the pain but it just made her "fuzzy headed" and worse (Tr. 32-33).  Plaintiff also had pain in her bones, difficulty using her left arm in many ways due to a shoulder injury, and hepatitis C, which caused limb pain, abdomen pain, and nausea (Tr. 33).  She had been in the hospital the previous December because of hepatitis C treatment and was

still having some symptoms (Tr. 33-34).

Plaintiff had been receiving treatment at the Mental Health Center for the previous six years and her doctor had prescribed Prozac for anxiety and depression (Tr. 34). Plaintiff testified to isolating herself and crying often due to pain and her inability to do anything and stated these conditions would prevent her from working (Tr. 34-35). Plaintiff was separated and lived with her parents; she had two children who did not live with her (Tr. 31-32, 35). Her mother took care of household chores and Plaintiff tried to help (Tr. 35). Plaintiff testified she did not get out of the house often, did not attend church, clubs, organizations, or visit friends or family, and only left the house for appointments, which was probably less than once a week (Tr. 35). Plaintiff had a driver's license and owned a vehicle, but did not drive (Tr. 36). Plaintiff did not drink, but she did use marijuana two to three times a week "for [her] stomach" and lack of appetite (Tr. 36). Plaintiff testified she got the marijuana from her father but was now on a medication that was helping her appetite so she was trying to stop using marijuana and had not used it in over two weeks (Tr. 36).

### B.    Vocational Expert Testimony

During the hearing, the ALJ solicited the testimony of vocational expert Adrian Bentley Hankins (the "VE") (Tr. 37-43). The ALJ first asked the VE to assume an individual age 37 with a GED who had the exertional limitations specified by state agency physician Dr. Pennington in his physical residual functional capacity ("PRFC") assessment form (Tr. 39). The VE testified that an individual with these limitations would have a slightly less than full range of light work available to them, but there would be jobs available; as examples, the VE testified this individual could work as a janitor or building cleaner, hand packer or packager, food preparation worker, laundry and dry cleaning worker or garment presser, or other production jobs such as assemblers and fabricators (Tr.

39-40). Approximately 2.5 to 2.6 million of these jobs would be available nationally, with 50,000 to 55,000 in Tennessee (Tr. 40).

In his second hypothetical, the ALJ asked the VE to assume an individual of the same age and with the same education and past relevant work, but with the physical limitations outlined by Dr. Breeding (Tr. 40). The VE testified that due to the ranges provided in Dr. Breeding's opinion as to Plaintiff's ability to sit or stand, the individual would likely be at less than a full range of sedentary work and would not be employable on a sustained basis for any type of work (Tr. 40-41). In the third hypothetical, the ALJ asked the VE to assume an individual of the same age and with the same education and past relevant work, but with the physical limitations opined by Dr. Grigsby (Tr. 41). The VE testified that Dr. Grigsby's opinion would also place the hypothetical individual at less than a full range of sedentary work and it would preclude the individual from any work that existed in significant numbers (Tr. 41). For the fourth hypothetical, the ALJ asked the VE to combine the physical restrictions outlined by Dr. Pennington from hypothetical one with the non-exertional limitations opined by Ms. Birchfield (Tr. 41). The VE testified the opinion of Ms. Birchfield would not have a significant impact, as she stated Plaintiff had moderate limitations in complex work instructions and social interaction with the public, co-workers or supervisors, but the unskilled occupations identified in response to the first hypothetical required minimal public contact (Tr. 41-42).

In the fifth hypothetical, the ALJ combined the physical restrictions outlined by Dr. Pennington from hypothetical one with the non-exertional limitations opined by Dr. Gaines (Tr. 42). The VE testified that because Dr. Gaines' opinion indicated marked limitations in numerous areas, the combination of psychological limitations would preclude employment (Tr. 42). For the ALJ's

sixth and final hypothetical, the ALJ asked the VE to assume an individual of the same age and with the same education and past relevant work, but to assume the ALJ fully credited Plaintiff's testimony during the hearing (Tr. 42-43). The VE testified that the combination of impairments Plaintiff described, particularly problems with her left upper extremity in addition to severe restrictions as to social interaction, would preclude all employment (Tr. 43).

### C. Medical Records

#### 1. Physical

In September 2003, Plaintiff's hepatitis C was evaluated by Dr. Michael Sullivan (Tr. 212-18). Dr. Sullivan noted an extensive history of street drugs, but Plaintiff was completely clean at the time of the evaluation; she reported depression and also reported a family history of hepatitis C (Tr. 212). Plaintiff reported some nausea and abdominal pain and a history of chronic obstructive pulmonary disease ("COPD") and asthma (Tr. 212-14). Dr. Sullivan observed Plaintiff had slightly elevated liver enzymes and diagnosed her with hepatitis C, acid reflux, chest pain and nausea and started her on Protonix (Tr. 216-17). Plaintiff returned to Dr. Sullivan in October 2004 and reported increased problems with pain, nausea, and weight loss; a colonoscopy, removal of her gallbladder and a liver biopsy were recommended (Tr. 219-24, 295, 300). Plaintiff was diagnosed with chronic gastritis and internal hemorrhoids after her endoscopy and colonoscopy (Tr. 226-28). A scan of Plaintiff's abdomen in October 2004 revealed cholelithiasis (Tr. 254). In November 2004, Plaintiff submitted to gallbladder removal and a liver biopsy; the biopsy revealed chronic hepatitis C with minimal necroinflammatory activity and minimal portal fibrosis (Tr. 205-08, 248).

Plaintiff began following with Dr. Charlene Grigsby in September 2008, at which time she reported pain and muscle spasms in her neck; past surgery after shattering her left shoulder in a fall;

brittle bones which explained the shattering; COPD; and hepatitis C (Tr. 480-83). Dr. Grigsby assessed Plaintiff with COPD, acute hepatitis C, postmenopausal osteoporosis, and osteoarthritis in the neck and shoulder and referred her for a bone scan (Tr. 482). Plaintiff's bone scan, performed September 10, 2008, revealed Plaintiff was osteoporotic, her fracture risk was high, and she needed treatment (Tr. 475-79). Dr. Grigsby prescribed Fosamax, counseled Plaintiff on taking calcium daily, and referred her to Dr. Manoj Srinath for her gastrointestinal and hepatitis C issues (Tr. 471-74). Plaintiff had her first appointment with Dr. Srinath on October 10, 2008 and he planned to get records from Dr. Sullivan before starting treatment (Tr.466-67). At Plaintiff's visit with Dr. Grigsby on October 16, 2008, Plaintiff reported the pain medications were helping even though she had been working a lot and had soreness in her joints, she was tolerating the Fosamax, and she was trying to stay active (Tr. 463-65).

On January 9, 2009, Dr. Srinath recommended Plaintiff arrange for mental health therapy prior to beginning treatment for hepatitis C due to her history of depression (Tr. 461-62). During her appointment with Dr. Grigsby on January 16, 2009, Plaintiff reported doing okay, but she was not able to tolerate the Fosamax and had bumped her right hip recently, causing lots of pain; scans of Plaintiff's right hip were normal (Tr. 456-59). Plaintiff was still having trouble with Fosamax on February 16, 2009 and reported starting treatment for hepatitis C soon (Tr. 451-53). Dr. Srinath discussed hepatitis C treatment options with Plaintiff on March 13, 2009 and Plaintiff had been informed she would be followed closely for mental health symptoms during treatment (Tr. 449-50). During Plaintiff's follow-up appointment with Dr. Grigsby on March 16, 2009, Plaintiff reported still having bone pains at night, but her pain medication was working well (Tr. 439-40). Plaintiff started hepatitis C treatment on April 10, 2009 and was tolerating the treatments well in April and

May 2009 (Tr. 407-08, 424-25, 428-30, 435-37). Plaintiff started taking Forteo for osteoporosis in May 2009 (Tr. 400-02). On July 10, 2009, Plaintiff reported mild fatigue but no depression from her hepatitis C treatments and Dr. Srinath noted the virus levels were undetectable (Tr. 389-90).

Plaintiff filled out a function report on July 14, 2009 and described her daily activities as getting up, taking medication, perhaps taking a shower, resting, taking more medication and eating lunch, sometimes trying to walk for five minutes in the yard, sometimes watching TV, eating supper and lying down before bedtime (Tr. 140-47). Plaintiff reported having problems sleeping due to bone pain, headaches, and stomach pain (Tr. 141). Plaintiff had some limitations with personal care due to problems getting her arms up; she could not cook anymore, go shopping, or do housework or yard work (Tr. 141-43). Plaintiff stated she felt weak and hurt and her medicine made her confused and nervous and made it difficult for her to concentrate (Tr. 143). Plaintiff helped her son with his homework and spent time with her children and her family one or two times a week (Tr. 141, 144). Plaintiff could only walk about 14 feet before she became out of breath, and would need to rest for 10 minutes before resuming (Tr. 145). Plaintiff had problems being sociable due to nerves and did not want to be around people (Tr. 145-46).

Plaintiff submitted to a physical examination with Dr. Samuel Breeding on August 21, 2009 (Tr. 484-87). Plaintiff reported arthralgias with osteoarthritis and osteoporosis with pain in her hips, back, shoulders, neck and knees (Tr. 485). Plaintiff reported shoulder surgery and bone density scans documenting her problems and was taking Forteo to help build her bones (Tr. 485). Plaintiff reported COPD but no pulmonary testing, hepatitis C that was under treatment which made her very fatigued, and manic depression that was aggravated by her hepatitis C medication (Tr. 485). Plaintiff reported last working for her father doing masonry work in January 2007 and reported she

was unable to work for the last few years mainly due to hepatitis C, but also because of arthralgias and shortness of breath (Tr. 485, 487). Plaintiff stated she had a driver's license but had been advised not to drive while she was on medication (Tr. 485). Dr. Breeding observed on examination that Plaintiff's gait and station were normal, she had a normal range of motion except for her left shoulder, and her muscle strength was adequate (Tr. 486). Dr. Breeding diagnosed Plaintiff with arthralgias, dyspnea with history of COPD, hepatitis C undergoing treatment, and a history of anxiety and depression (Tr. 486). Dr. Breeding opined Plaintiff was unable to do sustained physical activity, could lift 25 pounds occasionally, sit for four to six hours in an eight hour day, stand for two to four hours in an eight hour day, and may need to recline periodically (Tr. 486).

Plaintiff reported mild fatigue and low-grade fevers during a September 21, 2009 appointment with Dr. Srinath, but reported no symptoms of depression (Tr. 554-55). On November 7, 2009, Dr. Frank Pennington filled out a PRFC form (Tr. 509-17). Dr. Pennington opined Plaintiff could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to 10 pounds, stand and/or walk and sit for up to six hours in an eight hour day, was unlimited in her ability to push and/or pull, could only frequently perform postural limitations such as climbing, stooping, or kneeling, and was otherwise not limited (Tr. 510-13). Dr. Pennington noted the contrast between Plaintiff's function report, which indicated she could perform no activities, and Plaintiff's statements to her physicians and therapist about staying active and planning a baby shower (Tr. 514). Dr. Pennington opined Dr. Breeding's assessment was too restrictive based on the evidence in the file and further opined there was no evidence of acute respiratory disorder, severe arthritic limitations, or fractures due to osteoporosis; he noted Plaintiff was doing well with her hepatitis C treatment but that he had reduced the residual functional capacity to account for the expected fatigue due to those

treatments (Tr. 515-16).

On November 9, 2009, Plaintiff had a follow-up appointment with Dr. Grigsby and reported doing well, although she reported weight loss and generalized fatigue (Tr. 519-21). Plaintiff called December 3, 2009 to report severe weakness and all over bone pain and was concerned about her recent blood test that revealed she was neutropenic (Tr. 518). During her appointment with Dr. Srinath on December 4, 2009, Plaintiff complained of fatigue and body aches and no depression, but she was noted to have thrombocytopenia and leukopenia and Dr. Srinath ordered blood work and advised her to stop taking her hepatitis C treatment (Tr. 546-47). That same day, Plaintiff presented to Holston Valley Medical Center at the advice of Dr. Srinath for treatment of pancytopenia and severe neutropenia and was hospitalized until December 6, 2009; her medications were to be discontinued pending further evaluation by Dr. Grigsby and Dr. Srinath (Tr. 599-624). On December 11, 2009, Plaintiff's blood count had improved off the medication and she complained of fatigue; her medication was still discontinued pending further follow-up (Tr. 542-43).

Plaintiff continued to receive medication refills from Dr. Grigsby from January through August 2010 (Tr. 576-81, 633-35, 639). Plaintiff reported being in a lot of pain and complained of fatigue, shortness of breath, and coughing on April 20, 2010, but did not want to change her medication (Tr. 573-75). The severity of her pain with medication was noted at eight and without was noted at 10 (Tr. 574). Plaintiff had stopped taking Forteo because she no longer had insurance (Tr. 574). During her appointment July 23, 2010, Plaintiff reported pain at a level of 10, a lot more bone pain, and a recent fall on her hip that was causing a lot of pain (Tr. 636-38).

Dr. Grigsby filled out a medical assessment of ability to do work-related activities dated August 17, 2010 and opined Plaintiff could frequently and occasionally lift and/or carry up to 10

pounds, stand and/or walk for less than two hours in an eight hour workday, and sit for less than six hours in an eight hour workday (Tr. 626-27). The stated basis for the opinion was Plaintiff's severe degenerative osteoarthritis in her spine, hips, knees, hands, and shoulders and severe osteoporosis with high risk of bone fracture with minimal falls; Dr. Grigsby noted the conditions were chronic and would worsen despite medication (Tr. 626). Dr. Grigsby further opined Plaintiff could not work full time at any level and would be unable to work a full day without withdrawing two or more times (Tr. 627).

### 2.    Mental

Plaintiff was hospitalized at Indian Path Pavilion twice in 2004 after having suicidal thoughts of overdosing on drugs; she was drinking a case of beer a day and using cocaine and marijuana daily (Tr. 175-83). In March, she was diagnosed with polysubstance dependence and depression, not otherwise specified and her Global Assessment of Functioning ("GAF") score was 35[1] (Tr. 182-83). In May, Plaintiff was diagnosed with bipolar affective disorder, opiate abuse and adjustment order and her GAF was 30; Plaintiff was released after three days (Tr. 175-81). Upon discharge, an intake form was filled out by Frontier Health which diagnosed Plaintiff with major depressive disorder, recurrent and severe with psychotic features and polysubstance dependence; her GAF was 37 (Tr. 191-98). During a follow-up appointment at Holston Counseling Center, Plaintiff reported her mood was stable, she was maintaining sobriety, seemed to have a good relationship with her daughter, and was considering narcotics anonymous; she requested Prozac so she would not relapse into

---

[1]    A GAF score between 31 and 40 indicates "some impairment in reality testing or communication" or a "major impairment in several areas," a GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

depression (Tr. 189-90).

Plaintiff was referred to Frontier Health based on potential mental side effects from Interferon (her hepatitis C treatments) and was assessed on February 11, 2009; she reported no mental health symptoms and stated she had worked until two months ago, when her energy level bottomed out (Tr. 372-77). Plaintiff had not had mental health issues for the last four years and her main complaints were pain and decreased energy (Tr. 372). Plaintiff was diagnosed with major depressive disorder, recurrent and polysubstance dependence in remission and her GAF was 65 (Tr. 373). Plaintiff began therapy with Aimee Stamper, MA in March 2009 and was doing generally well for several months, although she reported being tired and worrying about her brother in May and June 2009; she missed a couple sessions these months and, at her next session on June 24, 2009, Plaintiff reported missing her previous session to plan her daughter's baby shower (Tr. 371, 378-83). Plaintiff's husband was out of jail but not bothering her, although her brother did upset her recently (Tr. 378). In July 2009, Plaintiff was having continued problems with her brother but cancelled her next three appointments, returning in September, when she reported her last three hepatitis C tests were negative and she was done with that treatment; she expressed concern that she would not have insurance to cover the rest of her bone treatments (Tr. 503-04, 506). Plaintiff's husband had agreed to pay for a divorce (Tr. 504).

Dr. Robert Paul filled out a psychiatric review technique form on August 31, 2009 (Tr. 489-502). Dr. Paul opined Plaintiff's mental health impairments were not severe because she had only mild limitations in all areas (Tr. 489-502). Specifically, Dr. Paul noted Plaintiff's allegations were not entirely credible because her treatment was prompted by hepatitis C treatments, she had minimal symptoms and a GAF of 65 at intake, and further treatment showed no significant change in her

mental condition (Tr. 501). As such, Dr. Paul opined Plaintiff's mental status was stable and indicated only mild limitations and her self-reported symptoms were over-stated (Tr. 501). Dr. Paul's assessment was affirmed on January 12, 2010 and it was noted Plaintiff's records through October 2009 showed no significant change (Tr. 561).

In October 2009, Plaintiff began therapy with Amy Willett, MA and reported her Interferon treatments left her hepatitis C free, but her bone growth treatments were painful and caused her to be sick and in bed; otherwise, Plaintiff was doing well (Tr. 505). An assessment on February 18, 2010 indicated Plaintiff's GAF was 53, her highest in the last six months was 55 and her lowest was 45 (Tr. 566-67). During her therapy session that day, Plaintiff reported an increase in depression and anxiety and described days she did not want to get out of bed; she stated it could be linked to the loss of her insurance and the cessation of her Interferon treatments because she was hoping the treatments would work even though they were painful (Tr. 570). Plaintiff's husband and brother continued to have legal problems and she reported the anxiety was causing her problems with concentration and being around crowds to the point where she would sometimes become angry and yell, throw, or hit (Tr. 570). In March 2010, Plaintiff was feeling a little better with the improved weather (Tr. 569). During her session in April 2010, Plaintiff reported recently blowing up and yelling, which she attributed to feeling unwell; otherwise she and her husband were getting along fine, she was going outside, but reported being tired and looked visibly tired (Tr. 568). Plaintiff reported spending more time out doing things, but was still staying away from crowds (Tr. 568).

Plaintiff submitted to a psychological examination with Kathy Birchfield, M.Ed. on May 20, 2010 (Tr. 582-86). Plaintiff reported being in special education classes starting in fifth grade and stated her last job was doing masonry work for her father (Tr. 582-83). Plaintiff reported leaving

her job waitressing because she could not deal with the public and had had another problem getting along with a manager while she worked as a cashier (Tr. 583). Plaintiff reported her last five tests for hepatitis C were all negative and she had previously had shoulder surgery for shattered bones (Tr. 583). Plaintiff reported past diagnoses of bipolar disorder and anxiety disorder and the review of her records also revealed diagnoses of major depressive disorder and polysubstance dependence (Tr. 583). Plaintiff stated she was currently on Valium because she was very nervous and let everything get to her, and she had been hospitalized for a breakdown four to five years ago (Tr. 583). Plaintiff reported continued weekly use of marijuana (Tr. 583). When asked about her daily activities, Plaintiff reported waking between five or seven in the morning, helping her mother do things, watching TV and sitting on the porch in the afternoon, and going to bed between one and two a.m. (Tr. 584). Plaintiff reported symptoms of depression from not being able to work and pain and also reported sadness, tearfulness, loss of interest in activities, increased manic and depressive episodes, and excessive worrying (Tr. 584). Ms. Birchfield administered the Millon Clinical Multiaxial Inventory and opined Plaintiff had a moderate level of pathology in her personality organization; may experience periods of severe emotional cognitive or behavioral dysfunction; had a marked deficit in social interest, occasional magical thinking, and depersonalization; may exhibit a chronic dysthymia mixed with anxiety and may at times have psychotic episodes; may appear to be entirely unresponsive to her environment at times; and had thoughts that might be unfocused or bizarre or involve delusional facets (Tr. 584). Plaintiff was assessed with generalized anxiety disorder, polysubstance dependence, schizoid personality disorder, not otherwise specified, depressive personality disorder, and her GAF was 53 (Tr. 585). Ms. Birchfield's report was countersigned by Dr. Diane Whitehead (Tr. 586).

Ms. Birchfield filled out a medical source statement of ability to do work-related activities and opined Plaintiff was moderately limited in her ability to understand, remember and carry out complex instructions; make judgments on complex work-related decisions; interact appropriately with the public, supervisors or co-workers, and respond appropriately to usual work situations and changes in a routine work setting (Tr. 587-89). Plaintiff had mild limitations in understanding, remembering and carrying out simple instructions and making judgments on simple work-related decisions (Tr. 587). Ms. Birchfield noted Plaintiff's mental health issues impaired her ability to think logically and remember information, her personality disorders impacted her ability to have appropriate emotional responses in situations, and her perception of reality was not accurate (Tr. 587-88). Ms. Birchfield further opined Plaintiff may need assistance managing her own funds if benefits were awarded (Tr. 586, 589).

At her August 12, 2010 therapy appointment, Plaintiff arrived 10 minutes late, looked somewhat drained of energy, reported increased depression since starting her treatments and stated she sometimes stayed in bed up to three days a week (Tr. 641). Dr. Gaines filled out a MRFC form on August 27, 2010 and opined Plaintiff was markedly limited in most areas and only moderately limited in carrying out short and simple instructions, making simple work-related decisions, interacting appropriately with the public, asking simple questions or requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers and peers without distracting them, maintaining socially appropriate behavior, being aware of hazards and taking normal precautions, and maintaining social functioning (Tr. 629-31). Dr. Gaines found Plaintiff had had three or more episodes of decompensation and noted he had reviewed records from March 2004 to present and Plaintiff had two psychiatric hospitalizations (Tr.

631).

## III.    ALJ'S FINDINGS

### A.    Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following

a five-step process.  20 C.F.R. § 404.1520(a)(4)(i-v).  The five-step process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009).  The claimant bears the burden to

show the extent of his impairments, but at step five, the Commissioner bears the burden to show that,

notwithstanding those impairments, there are jobs the claimant is capable of performing.  *See*

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### B.    ALJ's Application of the Sequential Evaluation Process

At step one of this process, the ALJ found Plaintiff had not engaged in any substantial

gainful activity since June 5, 2009, the application date (Tr. 11).  At step two, the ALJ found

Plaintiff had the following severe impairments: hepatitis C, osteopenia, osteoporosis, chronic

obstructive pulmonary disease, generalized anxiety disorder, polysubstance dependence, schizoid personality disorder, and depressive personality disorder (Tr. 11). At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 11). The ALJ noted that he specifically considered Listings 12.06, 12.08, and 12.09 (Tr. 11-12). The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work to the extent that she could lift and carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk for a total of six hours in an eight-hour day, could sit for six hours in an eight hour day, had no limitations as to pushing or pulling and could make frequent postural movements (Tr. 12). However, the range of light work was limited due to mild limitations in understanding, remembering and carrying out simple instructions and making judgments on simple work-related decisions and moderate limitations in understanding, remembering and carrying out complex instructions; making judgments on complex work-related decisions; interacting appropriately with the public, supervisors, and co-workers; and responding appropriately to usual work situations and to changes in a routine work setting (Tr. 12). At step four, the ALJ found Plaintiff was unable to perform her past relevant work (Tr. 17). At step five, the ALJ found that Plaintiff was 36, a younger individual, on the date the application was filed and, after considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 17). This finding led to the ALJ's determination that Plaintiff was not under a disability as of June 5, 2009 (Tr. 18).

## IV.     ANALYSIS

Plaintiff makes two arguments: first, she challenges the ALJ's assessment of certain medical

opinions in the record; and second, she challenges the ALJ's assessment of her subjective complaints as not being entirely credible.

## A. Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no

obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B.     Dr. Grigsby's Opinion and Dr. Breeding's Opinion

Plaintiff takes issue with the ALJ's assessment of the opinion of Dr. Grigsby, Plaintiff's treating physician, and the opinion of Dr. Breeding, a consultative examiner [Doc. 10 at PageID# 45]. Plaintiff argues the ALJ should not have rejected Dr. Grigsby's opinion because Dr. Grigsby had treated Plaintiff for almost three years, was familiar with her medical conditions and treatments, saw the claimant monthly or every three months for follow-up appointments, referred her for other treatment, and prescribed narcotic medications for Plaintiff's pain [*id.*]. Plaintiff argues the ALJ did not specify a legitimate, specific reason for rejecting Dr. Grigsby's opinion [*id.* at PageID# 48-49]. Plaintiff also asserts the ALJ erred in rejecting Dr. Breeding's opinion as his limitations are essentially consistent with those opined by Dr. Grigsby and Dr. Breeding formed his opinion after a physical examination of Plaintiff, which cannot be said of the file reviewing physician, Dr. Pennington [*id.* at PageID# 45-46]. Plaintiff contends Dr. Pennington's opinion is flawed because, although he took into account some fatigue from Plaintiff's hepatitis C medication, he did not account for the fatigue in combination with Plaintiff's body pain, which would prevent her from working [*id.* at PageID# 46]. Plaintiff further argues the evidence does not support the ALJ's

statements that Plaintiff is active, her fatigue is not severe enough to preclude work activity, and her pain is well managed; instead, Plaintiff asserts her pain levels fluctuated to near 10 on a scale of one to 10, which caused depression, and she consistently reported extreme fatigue [*id.* at PageID# 46-47]. Plaintiff argues there is little objective evidence upon which to rely to support Plaintiff's conditions, but she has been treated for various conditions, has consistently reported pain, and some conditions were verifiable by exam [*id.* at PageID# 47-48].

The Commissioner argues Dr. Grigsby's opinion was not entitled to controlling or significant weight because the ALJ properly noted it was inconsistent with her own findings and the other evidence in the record [Doc. 12 at PageID# 62]. The Commissioner asserts Dr. Grigsby's treatment notes indicate Plaintiff's medications were working well to treat Plaintiff's pain, Plaintiff was not having side effects, Plaintiff had only generalized fatigue from the hepatitis C treatments, and Plaintiff was tolerating Fosamax and said she was trying to stay active; furthermore, Dr. Grigsby did not reference COPD or hepatitis C as medical reasons supporting her assessment but, in any event, Plaintiff's COPD was well controlled [*id.* at PageID# 63-64]. The Commissioner argues the ALJ properly gave less weight to Dr. Grigsby's opinion and gave good reasons for rejecting the opinion by stating it was not supported by clinical findings, her own examination, or the evidence from other sources [*id.* at PageID# 64]. The Commissioner further argues the ALJ gave appropriate weight to Dr. Breeding's opinion because it was not supported by evidence in the record, was based primarily on Plaintiff's subjective complaints, and was inconsistent with minimal findings on examination, including a normal gait and station, negative straight-leg raising, and normal reflexes [*id.* at PageID# 65-66]. The Commissioner contends the ALJ did not base his rejection of Dr. Breeding's opinion on the fact that he examined Plaintiff only once and this was only one factor in

his analysis [*id.* at PageID# 66].  The Commissioner notes the ALJ need not give any weight to Dr. Grigsby's or Dr. Breeding's statements that Plaintiff was unable to work, as this is an issue reserved to the Commissioner [*id.*].

The law governing the weight to be given to a treating physician's opinion, often referred to as the treating physician rule, is settled: A treating physician's opinion is entitled to complete deference if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original).  Even if the ALJ determines that the treating source's opinion is not entitled to controlling weight, the opinion is still entitled to substantial deference or weight commensurate with "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source."  20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009).  The ALJ is not required to explain how he considered each of these factors, but must nonetheless give "good reasons" for rejecting or discounting a treating physician's opinion. *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011).  These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 545 (quoting SSR 96-2p).  Failure to give good reasons requires remand, even if the ALJ's decision is otherwise supported by substantial evidence, unless the error is de minimis. *Id.* at 544, 547.

The United States Court of Appeals for the Sixth Circuit recently reiterated that remand may be required when the ALJ fails to specify the weight afforded to a treating physician's opinion and fails to provide good reasons for giving the opinion an unspecified weight that is less than controlling. *Cole v. Astrue*, 661 F.3d 931, 938-39 (6th Cir. 2011). The *Cole* court stated "[t]his Court has made clear that '[w]e do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned." *Id.* at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)). In *Cole*, the Sixth Circuit again recognized that a violation of the "good reasons" rule could only be harmless error under three circumstances: where the treating source opinion was patently deficient such that it could not be credited; where the Commissioner adopted the opinion of the treating source or made findings consistent with that opinion; or where the Commissioner otherwise met the goal of the treating source regulation, 20 C.F.R. § 404.1527(d)(2). *Id.* at 940 (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)). While each case must be evaluated to determine if the required procedures have been appropriately followed, an ALJ's failure to specify the weight afforded to a treating physician could, on its own, provide sufficient grounds for remand. *Cole*, 661 F.3d at 939-40.

The ALJ stated as follows with respect to the medical opinions:

> As for the medical opinions of record, the undersigned gives great weight to the most recent opinions of the State Agency medical consultants, as their opinions are supported by clinical findings by both treating and examining physicians and is further consistent with the overall evidence of record including the claimant's conservative treatment history. However, the opinions of Dr. Breeding, Dr. Grigsby, and Dr. Gaines, as documented herein, are rejected as they are not supported by the objective evidence but are based primarily

on the claimant's complaints which have not been found to be of the severity alleged for the reasons set forth above. Further, Dr. Breeding's assessment was based on a one-time examination and Dr. Gaines is [a] nontreating and nonexamining source whose opinion is based on [sic] entirely on a review of the record. While Dr. Grigsby is a treating source, her opinion is not supported [by] her own examinations of the claimant or those of other treating and examining sources.

(Tr. 16-17).

I **FIND** the ALJ did not comply with the treating physician rule and did not provide adequate reasons for rejecting Dr. Grigsby's opinion. Giving the ALJ's opinion a most generous reading, the ALJ rejected Dr. Grigsby's opinion because Plaintiff had been treated conservatively and the opinion was not supported by objective evidence, was not supported by examinations of Plaintiff and treatment notes, and was based primarily on Plaintiff's subjective complaints, which were not fully credible. As the ALJ does not explicitly specify any weight given to Dr. Grigsby's opinion, the use of the word "reject" suggests he gave the opinion zero weight. His apparent decision to completely reject the opinion of Dr. Grigsby and give it zero weight, however, is not supported by substantial evidence. Plaintiff followed with Dr. Grigsby frequently for the two years prior to Dr. Grigsby's opinion. Dr. Grigsby played a significant role in Plaintiff's treatment during this time, including diagnosing her osteoporosis, referring her for hepatitis C treatment, and treating her osteoarthritis and other conditions. In Dr. Grigsby's November 2009 treatment notes, she wrote that Plaintiff was well known to her and noted her severe osteoporosis and osteoarthritis (Tr. 519). In December 2009, Plaintiff lost her insurance and, after this point, it appears she was unable to follow up with Dr. Grigsby as often, she could no longer continue some of her medication due to cost, and she could not change medication due to cost (Tr. 518, 573-74, 636). Under the circumstances, and without further explanation from the ALJ beyond generalized statements about Plaintiff's subjective

complaints and inconsistencies with some of Dr. Grigsby's examinations/notes, the ALJ did not provide good reasons as to why Dr. Grigsby's opinion was rejected and given no weight.

As noted above, a violation of the "good reasons" rule can only be harmless error under three circumstances: where the treating source opinion was patently deficient such that it could not be credited; where the Commissioner adopted the opinion of the treating source or made findings consistent with that opinion; or where the Commissioner otherwise met the goal of the treating source regulation, 20 C.F.R. § 404.1527(d)(2). *Cole*, 661 F.3d at 940. None of these circumstances apply in this case. Dr. Grigsby's opinion is not patently deficient on its face, the ALJ did not make findings consistent enough with Dr. Grigsby's opinion to outweigh his explicit rejection of the opinion, and the ALJ did not meet the goal of the regulation because it is not apparent from his decision why he completely rejected Dr. Grigsby's opinion.[2] Therefore, I **FIND** the ALJ's error with respect to the treating physician rule was not harmless.[3]

Accordingly, I **CONCLUDE** the ALJ did not properly give good reasons for affording the opinion of Dr. Grigsby zero weight and his decision to reject the opinion is not supported by substantial evidence. As such, I **CONCLUDE** Plaintiff's claim must be remanded to the

---

[2] The ALJ favored the assessment of Dr. Pennington and apparently relied in part on Dr. Pennington's comments as to Plaintiff's credibility. In addressing Plaintiff's credibility, Dr. Pennington noted that Plaintiff once reported to a mental health provider that she was "planning" a baby shower, but there is no explanation as to why this isolated comment would significantly impact Plaintiff's credibility as to her subjective physical complaints (Tr. 514). Plaintiff has raised an argument with respect to the ALJ's determination that her subjective complaints were not fully credible. Because the ALJ's determination as to credibility may be impacted by a proper consideration of the medical opinions and compliance with the treating physician rule, I do not address the credibility argument in this recommendation.

[3] In addition, although Dr. Breeding's opinion is not covered by the treating physician rule, it is also unclear whether substantial evidence supports the ALJ's complete rejection of his opinion under the circumstances.

Commissioner for compliance with the treating physician rule and full consideration of Dr. Grigsby's opinion in conjunction with other evidence in the record.

## V. CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I **RECOMMEND** that:[4]

> (1)     Plaintiff's motion for judgment on the pleadings [Doc. 9] be **GRANTED IN PART** and **DENIED IN PART**.

> (2)     The Commissioner's motion for summary judgment [Doc. 11] be **DENIED**.

> (3)     The Commissioner's decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) for action consistent with this Report and Recommendation.

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).